O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DR. ALISA WOLF, an individual,
ACTORS FOR AUTISM, a California
corporation,

             Plaintiff,

             vs.

JOSEPH "JOEY" TRAVOLTA, an
individual d/b/a INCLUSION FILMS;
INCLUSION WEAR, LLC, a California
Limited Liability Company; LITTLE
DOCUMENTARY FILMS, LLC, a
California Limited Liability Company,

             Defendants.

CASE NO. CV 14-00938-CAS-PJW

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
(Dkt. 142, filed December 11, 2015)

## I.   INTRODUCTION

On February 6, 2014, plaintiff Alisa Wolf ("Wolf") filed her original complaint in this lawsuit against defendant Joseph "Joey" Travolta, d.b.a. Inclusion Films ("Travolta"), asserting one claim for infringement of plaintiff's copyright in a written curriculum and program guide dated May 10, 2006 and entitled, "Practical Film Vocational Program For People with Developmental Disabilities" (the "first work" or "the May 2006 Work"). See Dkt. 1. On March 11, 2014, Wolf filed a first amended complaint adding defendants Inclusion Wear, LLC and Little Documentary Films, LLC to her copyright

1  infringement claim.  Dkt. 9.  On September 2, 2014, the Court denied Wolf's motion for a preliminary

2  injunction.  Dkt. 37.

3       On September 29, 2014, upon stipulation by the parties, Wolf filed a second amended complaint,

4  adding state law claims (collectively, the "state law claims") for (1) misappropriation of trade secrets;

5  (2) conversion; (3) interference with economic relationships; (4) breach of fiduciary duty; and (5)

6  violation of California Business and Professions Code section 17200, et seq. (California's unfair

7  competition law, or the "UCL").  Dkt. 39.  Also on September 29, 2014, defendants filed an Amended

8  Answer to the First Amended Complaint and Counterclaims.  Dkt. 40.  On November 24, 2014, the

9  Court dismissed defendants' counterclaims and Wolf's claims for misappropriation and conversion, all

10  without prejudice and with leave to amend.  Dkt. 79.

11       On December 18, 2014, plaintiff filed a third amended complaint that did not add

12  any parties or claims for relief.  Dkt. 84.  On March 8, 2015, plaintiff filed a motion for leave to file a

13  fourth amended complaint, which sought to add over thirty new parties and over twenty new claims for

14  relief.  Dkts. 93, 94.  On April 1, 2015, the Court denied plaintiff's motion for leave to amend, thereby

15  striking plaintiff's proposed fourth amended complaint.  Dkt. 1.

16       On August 5, 2015, upon stipulation by the parties, Wolf filed the operative fourth amended

17  complaint, adding co-plaintiff Actors for Autism ("AFA") and asserting, for the first time, an additional

18  claim for infringement of Wolf's copyright in a written work dated September 5, 2006, and entitled,

19  "Actors for Autism Practical Film Program Proposal" (the "second work" or "the September 2006

20  Work").  Dkt. 132 ("FAC").  The operative complaint thus asserts two claims for copyright infringement

21  (with one claim first asserted on February 6, 2014, and the other first asserted on August 5, 2015), and

22  five state law claims (all first asserted on September 29, 2014).

23       On December 11, 2015, defendants Travolta, Inclusion Wear, LLC, and Little Documentary

24  Films, LLC (collectively, "defendants") filed a motion for summary judgment as to all of plaintiffs'

25  claims.  Dkt. 142 ("Motion").  On December 21, 2015, plaintiffs filed an opposition to defendants'

26

27

28

motion. Dkt. 144 ("Opp'n").  On December 28, 2015, defendants filed a reply.  Dkt. 146 ("Reply").[1] On January 25, 2016, the Court provided the parties with a tentative order and held oral argument.  Dkt. 182.

On February 4, 2016, the Court provided the parties with a revised tentative order, advising plaintiffs that the Court was inclined, on its own motion, to grant summary judgment in favor of defendants as to the entirety of plaintiffs' two copyright claims.[2]  Dkt. 183.  The Court accordingly requested supplemental briefing on whether there were genuine disputes of material fact regarding alleged copyright infringement in the three years preceding Wolf's filing of this action.  Id.  On February 12, 2016, plaintiffs filed a supplemental brief meant to address this narrow issue.  Dkt. 184 ("P's Supp. Brief.").  On February 22, 2016, defendant filed a supplemental response.  Dkt. 185.  ("D's Supp. Brief").

On February 25, 2016 the Court provided the parties with an additional revised tentative order, dkt. 187, and on February 29, 2016, the Court held a final oral argument on the motion.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.   BACKGROUND

### A.   The Relevant Factual Background

Plaintiff Alisa Wolf met defendant Joseph "Joey" Travolta after she read an August 2003 newspaper article describing Travolta's film classes, his prior work with disabled children, and his vision for a "practical film school."  Dkt. 142-1 (Defendants' Statement of Undisputed Facts ("DS")) at ¶ 1; Dkt. 175 (Plaintiffs' Amended Statement of Undisputed Facts ("PS")) at ¶ 1.  After meeting, Wolf

---

[1] Both parties also filed objections to the evidence presented in support of and in opposition to the instant motion.  See Dkts. 144-2 (Plaintiffs' Objections), 148 (Defendants' Objections).  To the extent the parties object to any evidence not discussed in this order, these objections are **OVERRULED AS MOOT** because the Court does not rely on the objected-to evidence in ruling on the instant motion.  The parties may renew any and all such evidentiary objections at a later date in this proceeding.

[2] "After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."  Fed. R. Civ. P. 56(f)(3); see also Nunley v. City of Los Angeles, 121 F.3d 716 (9th Cir. 1997) ("The district court clearly possesses the authority to grant summary judgment on its own motion, if the parties receive adequate notice to bring forward their evidence.") (citation omitted).

and Travolta worked together to incorporate autistic children, like Wolf's son, into Travolta's acting programs. DS at ¶ 2; PS at ¶ 2. In December 2004, Wolf established Actors for Autism ("AFA"), a non-profit organization that provides performing arts and film-making programs for individuals with disabilities, including persons on the autistic spectrum. Dkt. 142-3 (February 9, 2015 Declaration of Alisa Wolf ("Wolf Decl. II")) at ¶¶ 17, 45. Wolf served as AFA's Executive Director, while Travolta served as its President. Id. at ¶ 45; see also DS at ¶ 3; PS at ¶ 3.

In late 2005, Wolf and Travolta met with representatives of the Lanterman Regional Center (the "Center"), including Director of Community Services Karen Ingram ("Ingram"), regarding whether the Center would "vendorize" (i.e, authorize payments towards) AFA's own acting classes for autistic children. DS at ¶ 4; PS at ¶ 4. The parties dispute what occurred during this meeting. According to defendants, when representatives from the Center asked about potential vocational skill programs, Travolta responded by "proposing the use of his long gestating idea for a practical film school for the center's clients." DS at ¶ 5. In a declaration, Travolta avers that after the meeting, he "instructed [plaintiff] Wolf [to put] together documentation for [his] vocational film program idea for submission to the Center," which he then "reviewed and edited." Dkt. 142-2 (December 11, 2015 Declaration of Joseph "Joey" Travolta ("Travolta Decl.")) at ¶ 3; DS at ¶ 6. Travolta subsequently made efforts to obtain a slate of films for production that would serve as "the backbone" for the program. DS at ¶ 8; PS at ¶ 8. Wolf denies that Travolta ever made any proposal during the meeting with the Center, insisting instead that it was Wolf who, during the meeting, mentioned "[her] original concept for the Practical Film Vocational Program for adults with disabilities":

> Th[e] program would be for adults on the autistic spectrum to learn skills
> in the technical side of film-making in order to obtain employment in the
> film industry. Defendant Travolta and Ms. Ingram had absolutely no
> input regarding my Practical Film Vocational Program for adults with
> disabilities, as it was solely my original concept which I was disclosing
> to them at the meeting for the very first time.

Wolf Decl. II at ¶ 57.

Months after the meeting, in a letter dated April 13, 2006 and addressed to "Joey Travolta, Actors for Autism, 831 S. Main Street, Burbank, CA 91506," Karen Ingram stated that the Center had approved "the film-making program" at "the rate of $10,000 for the 6 month program." Travolta Decl., Ex. O ("April 13, 2006 letter); see also Wolf Decl. II at ¶¶ 64-65; DS at ¶ 7, PS at ¶ 7. The letter also indicated that in order to "complete the service design," additional information regarding the program was needed, including, *inter alia*, the entrance criteria, referral process, exit criteria, and outcomes. Travolta Decl., Ex. O.

Travolta and Wolf ended their professional collaboration in the summer of 2006. DS at ¶ 9; PS at ¶ 9. Specifically, Travolta resigned his position as President of AFA, effective July 11, 2006, and AFA moved out of the offices and performance space that Travolta had previously permitted the organization to use without payment of rent. DS at ¶¶ 9-10; PS at ¶¶ 9-10. Wolf avers that around this time, Travolta formed a separate business entity of his own. Wolf Decl. II at ¶ 94. Shortly thereafter, on August 11, 2006, Wolf registered the first of her two copyrighted works, "Practical Film Vocational Program For People with Developmental Disabilities," with the United States Copyright Office. DS at ¶ 11; PS at ¶ 11; Dkt. 142-3 ("Gebelin Decl."), Ex. E (Practical Film Vocational Program, dated May 10, 2006).

In a letter dated September 19, 2006, Wolf sent a "completed proposal for [a] practical film program" on behalf of Actors for Autism to the Center's Karen Ingram. Gebelin, Ex. G; DS at ¶ 13; PS at ¶ 13. Wolf avers that she sent this letter "based on [the] agreement reflected in [Ingram's] letter dated April 13, 2006." Wolf Decl. II at ¶ 97. While awaiting a response from the Center, the AFA Board of Directors held a board meeting on December 4, 2006. See id. at ¶ 108; see also Gebelin Decl., Ex. I (December 4, 20006 meeting minutes).[3] Wolf avers that at this meeting, she informed the Board of

_____

[3] These board minutes read, in relevant part, as follows:

> [Wolf] stated that she contacted the attorney, Shannon Nash[,] to get her opinion regarding the vocational academy. It was clear that Joey Travolta could be sued for taking the program. In addition, he would be responsible for any money due for attorneys fees and any money received

1

2

> for the program should we win the case.  However, [Wolf] stated that she
> was also advised about the other issues that would arise and the press
> given to Actors for Autism and Joey Travolta.  It was decided by the
> board not to pursue a law suit [*sic*] at this time, rather to write a different
> program to submit to the regional center. [Board members] Adam
> [Shawn] and Robyn [Eastman] agreed that was the best approach to take
> in this situation.

Gebelin Decl., Ex. I.  Although Wolf initially offered these board minutes as an exhibit to a prior declaration, she now objects to their admission, citing (without argument) to Federal Rules of Evidence ("FRE") 601 (competency to testify), 602 (need for personal knowledge), 701 (opinion testimony by lay witnesses), 801 (hearsay), and 901 (failure to authenticate).  See Dkt. 144-2 (Plaintiffs' Objections).  First, with respect to authentication under FRE 901, the Court finds plaintiff's own sworn statement regarding the authenticity of the document to be "sufficient to support a finding that the item is what the [defendant] claims it is."  Fed. R. Evid. 901.  Again, Wolf herself produced this document to defendants and also attached it to her July 23, 2014 declaration, submitted in support of her motion for a preliminary injunction.  See Dkt. 19-1 (Wolf Decl. I), ¶ 26 ("Attached hereto as Exhibit B is a true and correct copy of the Minutes of meetings of the Board of Directors of Actors for Autism.").  However, in order for the Court to rely upon the statements contained within the minutes, both the document itself *and* the statements contained therein must (1) fall under an exception to the rule against hearsay, pursuant to FRE 803, or (2) not constitute hearsay at all, pursuant to FRE 801.

Here, the *statements*—i.e., that "[i]t was clear that Joey Travolta could be sued for taking the program," but the board "decided . . . not to pursue a law suit [*sic*] at th[at] time" and instead to "write a different program to submit to the regional center"—are not hearsay, as they are offered only to demonstrate what was discussed at the meeting, not for the truth of the matters asserted.  In other words, these statements are offered only to demonstrate that AFA Board members, including Wolf, attended a 2006 Board meeting wherein Travolta's alleged infringement was expressly discussed.

Nonetheless, it is unclear whether the document itself (as opposed to the statements contained therein) is admissible pursuant to an exception to the rule against hearsay.  See Fed. R. Evid. 803.  On the one hand, neither party has submitted "testimony of [a] custodian or another qualified witness" regarding the preconditions to the document's admission as a record of a regularly conducted activity pursuant to FRE 803(6).  See Fed. R. Evid. 803(6)(a)-(e).  On the other hand, defendants argue that the document itself constitutes an admission of a party opponent and therefore does not constitute hearsay at all, pursuant to FRE 801(d).  Under FRE 801(d), an opposing party's statement being offered against the party is not hearsay if it: "(A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or (E) was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(A)-(E).  Here, the board minutes arguably constitute a statement by party opponent Actors for Autism, as they appear to have been "made by a person whom the party authorized to make a statement on the subject," see FRE 801(d)(2)(C), or were otherwise "made by the party's agent or employee on a matter within the scope of that relationship and while it existed," FRE 801(d)(2)(D).  Nonetheless, because the Court concludes

6

Directors of Actors for Autism of her concerns that Travolta was "using [her] program without permission." Id. at ¶ 108. Wolf also states that she shared with the Board the advice of an attorney, Shannon Nash ("Nash"), whom Wolf had contacted "to get her opinion" regarding whether "there was any action [Wolf] could take against Defendant Travolta at the time." Id. at ¶ 107. According to Wolf, Nash advised her that "although I [Wolf] thought it seemed clear that Defendant Travolta was using the program, more evidence was needed before any legal action" could be taken. Id. at ¶ 108. More specifically, Nash advised Wolf that she "should not file a frivolous lawsuit," but "if [she] could find evidence and proof, [she] could file a lawsuit against Defendant Travolta for taking [her] program." Id. at ¶ 107.

Roughly three weeks after the December 2006 AFA Board meeting, the Center informed plaintiffs, in a letter dated December 28, 2006, that it was "unable to consider [AFA's] request for vendorization" because the Center "[had] been working with Joey Travolta to develop a work program that would introduce regional center clients to the various aspects of film production – a program *identical to your proposed program*." Gebelin Decl. , Ex. H (December 28, 2006 letter) (emphasis added); see also Wolf Decl. II at ¶ 98 ("Ms. Ingram's letter stated that Lanterman Regional Center had been working with Defendant Travolta *to develop a work that was 'identical' to my proposed program*.") (emphasis added). Wolf states that "[f]or this reason," she "suspected Defendant Travolta had *merely changed the cover sheet to [her] program design*" and submitted it to the Center. Wolf Decl. II at ¶ 99 (emphasis added). Because the Board did not want "bad press," however, the Board "agreed that [Wolf] should write a different program design." Id. at ¶ 108.

In the meantime, Wolf wrote a letter to the Center in response to the rejection of her practical film program design proposal. In this letter, dated January 23, 2007, Wolf asserted on behalf of AFA that (1) "[a]ll documents that [she] submitted to [the Center] regarding the film program are copy written [*sic*] by [her] and registered with the U.S. State Department [*sic*]," that (2) "Travolta broke his fiduciary duty when he continued to have conversations with [the] Lanterman Regional Center about [AFA's]

---

that it need not rely upon the board minutes for purposes of the instant motion, the Court does not consider them.

program for his own personal gain," and that (3) after Travolta left AFA "any further conversations regarding this program should have ceased."  Wolf Decl. II  at ¶ 109; see also DS at ¶ 16; PS at ¶ 16. The letter also asserted that by law "any and all concepts, programs and services which are developed under a public charity belong to the charity" such that "board member[s] [like defendant Travolta] may not take an idea, concept, program, or service for personal gain."  Wolf Decl. II  at ¶ 109.  Eventually, Wolf met in person with representatives from the Center and decided to submit a different 2-year vocational program that would include film, television, and animation vocational training.  DS at ¶ 17; PS at ¶ 17.  Wolf has stated that despite having received assurances at the time from Travolta and Ingram that the program service design was not copied, she still believed that Travolta was harming plaintiffs by taking their opportunities and ideas and breaching fiduciary duties to them.  DS at ¶ 18, PS at ¶ 18; see also Wolf Decl. II at ¶¶ 101-102, 106, 111.

Plaintiffs offer the following additional facts, all of which are disputed by defendants, in whole or in part:

Wolf avers that she spoke with Travolta in early 2007 and asked him whether he was using either of her works in developing a program for vendorization.  PS at ¶ 45.  Travolta purportedly denied that he was doing so, insisting that he was working with the Center to develop a "different program."  Id. Wolf also states that in early 2007 she spoke with Richard Bluth, one of Travolta's business associates, who denied that either he or Travolta were using Wolf's works in any way.  See id. at ¶¶ 46-48.  Wolf accordingly avers that "despite her efforts to learn [of the alleged infringement], all of [her] suspicions disappeared regarding [Travolta's] copying [of] her practical filmmaking program . . . ."  Id. at ¶ 48. From early 2007 until November 25, 2012, Wolf asserts that she did not have "any verifiable information that Mr. Travolta had actually acquired a copy of the May 2006 Work [or the] September 2006 Work, that he provided either of them to any third party in exchange for or in order to receive money, or that Mr. Travolta was contracting with [anyone] to perform or license the program designs in the May 2006 Work or [the] September 2006 Work."  Id. at ¶ 49.  Plaintiff further states that on November 25, 2012, Dale O'Prandy, an individual purporting to be a business associate of Travolta, informed her that Travolta was using her works in order to gain substantial financial benefits through his business, Inclusion Films.  Id. at ¶ 50.  Wolf avers that after this conversation, she took steps to

confirm that defendants Travolta and Inclusion Films had in fact accessed her works and had "vendored" a practical filmmaking program for autistic persons based upon unauthorized copies of her works. Id. at ¶ 51.

### B.     Plaintiffs' Copyrighted Works and Defendants' Allegedly Infringing Work

#### 1.     Plaintiffs' May 2006 Work

Wolf registered the work underlying her first claim for copyright infringement on August 11, 2006. DS at ¶ 10; PS at ¶ 10; Wolf Decl. II at ¶ 4. The work, entitled "Practical Film Vocational Program For People with Developmental Disabilities," is dated May 10, 2006. Gebelin Decl., Ex. E. The work itself is comprised of a title page and three pages of text detailing the program under the following six headings: (1) Mission Statement; (2) Entrance Criteria; (3) Referral Process; (4) Exit Criteria; (5) Participation Limits; and (6) Outcomes. See id.

Defendants contend, and plaintiffs dispute, that all of these topics besides the mission statement were prepared in direct response to a list of elements and a brief description of the required information "needed to complete the service design" detailed in a letter written by the Center to Travolta and AFA in April 2006. DS at ¶ 32. Defendants also contend that substantial portions of the language in this work are copied verbatim from other documents that defendants have uncovered during the course of this litigation. Specifically, defendants contend that the first paragraph and list of five elements from the May 2006 Work's "Referral Process" section copies 87.5% of its 247 words verbatim from a July 18, 2005 PDF document regarding Americans with Disabilities Act compliance, created by the Texas Tech University Health Science Center's Student Services Program. DS at ¶ 33. Defendants further assert that the remaining paragraph of the "Referral Process" section copies 36 of its 81 words from the screening section of an employment opportunity flyer published on March 8, 2006 by the College of the Siskiyous. DS at ¶ 34. In addition, defendants assert that the September 2006 Work's "Outcomes" section shares large blocks of language verbatim with a course description published on the Internet by the London Film Academy, including identical language from that section's opening paragraph. DS at ¶ 35.

/ / /

/ / /

9

### 2.   Plaintiffs' September 2006 Work

Wolf registered the work which forms the basis of her second claim for copyright infringement on June 18, 2015, shortly before the filing of her fourth amended complaint in this litigation.  DS at ¶ 35; PS at ¶ 35.  Wolf asserts that this work, whose title page is dated September 5, 2006, was actually created in late 2006.  According to defendants, portions of this document "used material" from various third-party sources, including the Vancouver Film School's website, Columbia College Hollywood's "production course," and the New York Film Academy's website.  See DS at ¶¶ 36-38.

### 3.   Defendants' Allegedly Infringing Work and the Allegations in the Operative Complaint

The specific infringing work plaintiff identifies in the fourth amended complaint is a "Program Service Guide" dated April 22, 2010, and entitled "Practical Film Workshop: A 20 Week Vocational Based Program For Adults with Developmental Disabilities."  FAC, Ex. F; see also Travolta Decl., Ex. S.  The allegedly infringing document contains a title page and 11 pages of text detailing defendants' vocational program under various subheadings.  See Travolta Decl., Ex. S (document).  In the operative complaint, plaintiffs allege that defendants infringed Wolf's two copyrights "by copying large portions of [both her May 2006 and September 2006 Works], including lengthy verbatim passages, into [defendants'] Inclusion Films program guide, which [defendants] then published in the course of advertising and promoting their vocational film-making programs."  FAC at ¶¶ 91(first copyright claim); 100 (second copyright claim).  It is undisputed that defendants first published a version of this particular work in or about 2010 by offering a version of the document for download on the inclusionfilms.com webpage.  DS at ¶ 29; PS at ¶ 29.

### III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

/ / /

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

## IV.   DISCUSSION

In the instant motion, defendants move for summary judgment as to all of plaintiffs' claims on two grounds. First, defendants argue (a) that portions of plaintiffs' two copyrighted works were copied verbatim from third-party sources, (b) that such "unauthorized derivation" pervades the entire works, and (c) that plaintiffs accordingly do not hold valid copyrights in the works. Second, defendants argue that aside from any alleged copyright infringement that occurred within three years of the filing of this action, all of plaintiffs' claims are barred by the relevant statutes of limitation, as each claim arises from conduct of which plaintiffs were aware or were sufficiently placed on notice in 2006 and 2007. The Court addresses the merits of defendants' arguments in the discussion that follows.

/ / /

/ / /

### A.    Plaintiffs' Underlying Copyright Infringement Claims

A copyright infringement claim has two elements: "(1) [plaintiff's] ownership of a valid copyright, and (2) [defendant's] copying of constituent elements of the work that are original." <u>Feist Publ'ns v. Rural Tel. Serv. Co., Inc.</u>, 499 U.S. 340, 361 (1991).  Throughout the course of this litigation, plaintiff Alisa Wolf has maintained that her two copyrighted works are original and that she did not lift portions of text from third-party sources when generating her written works.  <u>See, e.g.</u>, Dkt. 156 (Dec. 3, 2015 Deposition of Alisa Wolf), at 262:3–17, 263:14–24, 264:2–265:4; 266:17–19; <u>see also</u> Wolf Decl. II at ¶ 73 (" I created a[] draft of the program design for the practical film program dated May 10, 2006 . . . on my own without the contribution of others. "); <u>id.</u> at ¶ 84 ("At all times, I authored my Work and all derivative work without the contribution from anyone else.").  In the instant motion, defendants submit evidence of third-party sources that purportedly pre-date the creation of plaintiffs' works and appear to contain language substantially similar or identical to that of plaintiffs' works.  <u>See</u> Dkt. 142-4 (Palmer Decl.), Ex. T (Texas Tech University Health Science Center's Student Services Program regarding ADA Compliance for Students with Disabilities), Ex. U (March 8, 2006 College of the Siskiyou employment opportunity flyer), Ex. V (London Film Academy website), Ex. W (Vancouver Film School website), Ex. X (Columbia College Hollywood production course), Ex. Y (New York Film Academy website).

Due to the purportedly "unauthorized derivative nature" of Wolf's works, defendants contend that "their content is not original to her, she cannot receive copyright protection, and therefore the works cannot support any infringement claims against Defendants."  Motion at 16.  In opposition to the instant motion, plaintiffs lodge various objections to defendants' evidence and further contend that such evidence should not be considered by the Court, because defendants did not properly meet and confer to resolve issues pertaining to the originality of Dr. Wolf's copyrighted works.[4]  Opp'n at 2.  Ultimately,

---

[4] Specifically, plaintiffs object to these documents under Federal Rules of Evidence 601 (competency to testify), 602 (need for personal knowledge), 701 (opinion testimony by lay witnesses), 801 (hearsay), and 901 (failure to authenticate), as well as Federal Rule of Civil Procedure 26(e)(1)(A) (untimely service of exhibit).  <u>See</u> Dkt. 144-2 (Plaintiffs' Objections).  In light the Court's finding that consideration of this evidence does not inform a different result in the instant motion, plaintiffs' objections are **OVERRULED AS MOOT**.  The Court also notes that these documents are the subject

however, the Court concludes that even if Wolf were to admit that portions of her works were copied from other sources—or alternatively, even if defendants' evidence compels such a conclusion—this still would not preclude a jury from determining that Wolf's works nonetheless possess sufficient creativity to warrant copyright protection as derivative works.[5]  Opp'n at 22.  Accordingly, defendants' motion must be denied as to its challenge to the validity of plaintiffs' two copyrights.

### 1.    Originality and Ownership of a Valid Copyright

Copyright protection extends only to "original works of authorship."  17 U.S.C. § 102.  "Although the amount of creative input by the author required to meet the originality standard is low, it is not negligible."  Satava v. Lowry, 323 F.3d 805, 810 (9th Cir. 2003).  A "certificate of registration from the U.S. Copyright Office entitle[s] [plaintiff] to a 'rebuttable presumption of originality.' "  Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1075 (9th Cir. 2000).  However, "the statutory presumption of validity can be rebutted if the alleged infringer demonstrates that the plaintiff's work 'is not original but copied from another's work.' "  Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc., 122 F.3d 1211, 1218 (9th Cir. 1997) (quoting N. Coast Indus. v. Jason Maxwell, Inc., 972 F.2d 1031, 1033 (9th Cir. 1992)); see also Masquerade Novelty, Inc. v. Unique Indus., Inc., 912 F.2d 663, 668-69 (3rd Cir. 1990) ("Where, for example, the issue is whether the copyrighted article is 'original,' the presumption will not be overcome unless the defendant offers proof that the plaintiff's product was copied from other works or similarly probative evidence as to originality.").

At bottom, defendants' argument is that (1) the degree of similarity between portions of plaintiffs' works and the purportedly preexisting third-party works is so substantial as to compel the

---

of a motion in limine that is currently pending before the Court.  See Dkt.157.

[5] The Court notes that defendants do not argue that even absent any alleged unauthorized copying, plaintiffs' works would nonetheless not be subject to copyright protection.  For example, defendants do not contend that plaintiff is improperly attempting to extend copyright protection of her written works to an idea, concept, process, system, or other unprotectable subject matter.  See 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.") (emphasis added).  Instead, defendants' argument appears limited to whether the degree of Wolf's allegedly unauthorized copying of third-party written works so pervades her works that they should not be afforded copyright protection.

13

conclusion that plaintiff copied these works; (2) plaintiffs' copying was necessarily unauthorized, in light of her repeated denials that any copying occurred; and (3) plaintiffs' copyrighted works are accordingly "unauthorized derivative works" and therefore not subject to copyright protection.

In their motion, defendants primarily rely upon Sobhani v. @Radical.Media Inc., where the court granted defendant's motion for summary judgment as to a copyright infringement claim.  See 257 F. Supp. 2d 1234, 1241 (C.D. Cal. 2003) (Wilson, J.).  The plaintiff in Sobhani, an aspiring video commercial director, brought a copyright infringement action against a producer who had produced a commercial substantially similar to a "spec" commercial that the plaintiff had previously shared with the defendant.  In a motion for summary judgment, defendant argued, like defendants in the instant motion, that plaintiff's own work lifted elements of copyrighted third-party materials without permission, such that plaintiff's work was an "unauthorized derivative work," and accordingly could not support an infringement claim.  See id. at 1239.  In response, plaintiff argued that at minimum, his "original contributions" to his productions were entitled to copyright protection, even if the work as a whole is an unauthorized derivative work.  Id.  Ultimately, the Court concluded that "[b]ecause [the] copyrighted [third-party] work *pervades* [Plaintiff's] derivative work, and because Plaintiff used the previous work without [the third party's] authorization, no copyright protection is afforded" to plaintiff's work.  Id. at 1240.

While it is true, as defendants contend, that courts may "deny copyright to derivative works in which [a] pre-existing work *tends to pervade the entire derivative work*," courts need not deny protection "to collective works in which the infringement arises from the copying of the selection and arrangement of a number of pre-existing works," nor must courts necessarily deny protection "*per se* [due to] the reproduction of any particular prior work."  1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 3.06 (2015) (citing, *inter alia*, Sobhani).  As the Ninth Circuit has explained, the Copyright Act "provides that a derivative author may own the copyright in material the author contributed to a preexisting work, but not in infringing material or material the author did not create."  U.S. Auto Parts Network, Inc. v. Parts Geek, LLC, 692 F.3d 1009, 1016 (9th Cir. 2012); see also id. ("[C]opyright protection for a derivative work 'does not extend to any part of the work in which such [preexisting] material has been used unlawfully.' ") (citing 17 U.S.C. § 103(a)).

14

Thus, even if the Court concluded, based upon defendants' evidence submitted in support of this motion, that Wolf did in fact copy portions of her copyrighted works from (copyrighted) third-party sources without authorization, the Court would also need to conclude, as a matter of law, that the purportedly cribbed portions so "pervade" the works that they render them completely unprotected under the Copyright Act.  The Court finds that on the current record, it cannot make this finding as a matter of law.  A reasonable jury could find that despite any substantial similarities between plaintiffs' works and those of third-party sources, those additional portions of plaintiffs' works not traceable to any third-party source demonstrate that the derivative portions do not pervade the entire works.  See Shaw v. Lindheim, 919 F.2d 1353, 1355 (9th Cir. 1990) (noting "summary judgment is not highly favored on questions of substantial similarity in copyright cases").

Accordingly, defendants' motion for summary judgment as to the invalidity of plaintiffs' underlying copyrights is denied.

### B.      Statutes of Limitation and the Discovery Rule

Defendants contend that plaintiffs' copyright and state law claims all accrued in 2006 or 2007, at which time Wolf was either aware or sufficiently placed on notice of defendants' alleged conduct underlying these claims.  Accordingly, defendants first argue that plaintiffs are barred from seeking any damages for alleged copyright infringement that occurred outside the relevant three-year statute of limitations.  Defendants then argue that absent application of an equitable exception, all of plaintiffs' state law claims are time barred.

### 1.      The Relative Burdens of Proof at Summary Judgment

Because the statute of limitations is an affirmative defense, defendants bear the initial burden on a motion for summary judgment of demonstrating that plaintiffs' claims are time barred.  See Celotex, 477 U.S. at 323; see also Cal. Sansome Co. v. U.S. Gypsum, 55 F.3d 1402, 1406 (9th Cir. 1995) ("A defendant raising the statute of limitations as an affirmative defense has the burden of proving the action is time barred.").  Defendants primarily attempt to meet this burden in the instant motion by relying upon plaintiff Wolf's own testimony regarding her strong suspicions (and arguably her knowledge), dating from as 2006 and 2007, regarding defendants alleged wrongdoing.  If defendants meet their burden, the burden then shifts to plaintiffs as the non-moving party to establish that there is

1  sufficient evidence in the record from which a reasonable trier of fact could conclude that plaintiffs'

2  claims are not time barred.  See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099,

3  1103 (9th Cir. 2000) ("If . . . a moving party carries its burden of production, the nonmoving party must

4  produce evidence to support its claim or defense.").

5       As is relevant here, if defendants establish that plaintiffs' claims are time barred absent

6  application of an equitable exception, plaintiffs bear the burden of demonstrating the applicability of

7  any such exception, including the delayed discovery rule.  See O'Connor v. Boeing N. Am., 311 F.3d

8  1139, 1150 (9th Cir. 2002) ("Because Plaintiffs have the burden of proof at trial to establish that they

9  are entitled to the benefit of the discovery rule, to defeat summary judgment *they [are] required to come*

10  *forward with evidence establishing a triable issue of fact with regard to whether the discovery rule*

11  *applies*.") (emphasis added) (citing Celotex, 477 U.S. at 323); Gabriel Techs. Corp. v. Qualcomm, Inc.,

12  857 F. Supp. 2d 997, 1003 (S.D. Cal. 2012) (noting that plaintiff bears the burden on summary judgment

13  of establishing entitlement to delayed accrual under the discovery rule).  Plaintiffs argue in opposition

14  to the instant motion that "[d]ue to the sparse evidence on record, and construing it in the light most

15  favorable to [p]laintiffs, AFA has demonstrated that at the very least a triable issue exists concerning

16  its discovery of [d]efendants' wrongdoing," such that the Court cannot conclude that plaintiffs' claims

17  are time barred as a matter of law.  Opp'n at 17 (emphasis added).  Essentially, plaintiffs contend that

18  they were not sufficiently aware of defendants' conduct until November 25, 2012 and that therefore,

19  under the discovery rule, none of their claims accrued until November 2012—well within two years of

20  this suit's initiation.

21              **2.    Plaintiffs' Copyright Infringement Claims**

22       Plaintiffs' first claim for copyright infringement relates to her May 2006 Work and was first

23  asserted on February 6, 2014, the day on which this suit was filed.  Plaintiffs' second claim for copyright

24  infringement relates to her September 2006 Work and was first asserted on August 5, 2015, the day on

25  which the operative fourth amended complaint was filed.  Based upon the Copyright Act's three-year

26  statute of limitations, see 17 U.S.C. § 507(b) (discussed *infra*), defendants argue that plaintiffs should

27  be barred from seeking damages for any alleged copyright infringement that occurred before February

28  6, 2011 as to the first claim, or before August 5, 2012 as to the second claim.  As explained in the

1    discussion below, the Court agrees, and finds that plaintiffs are barred from seeking damages

2    attributable to infringement occurring beyond the three years preceding plaintiffs' assertion of the two

3    copyright claims.

4                    **i.       Accrual of Plaintiff's Claims under 17 U.S.C. § 507(b)**

5            Section 507(b) of the Copyright Act provides that copyright claims must be "commenced within

6    three years after the claim accrued." 17 U.S.C. § 507(b). A claim "ordinarily accrues 'when [a] plaintiff

7    has a complete and present cause of action.' " Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962,

8    1969 (2014) (quoting Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.,

9    522 U.S. 192, 201 (1997)) (internal quotation marks omitted).  However, in Roley v. New World

10   Pictures, Ltd., the Ninth Circuit "interpreted the term 'accrue,' as it is used in § 507(b), to be the

11   moment when the copyright holder 'has knowledge of a violation *or is chargeable with such*

12   *knowledge*.' " Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004) (emphasis

13   added) (quoting Roley, 19 F.3d at 481).[6]  In further construing the language of Roley, the Ninth Circuit

14   has explained that "§ 507(b) permits damages occurring outside of the three-year window, so long as

15   the copyright owner did not discover—*and reasonably could not have discovered*—the infringement

16   before the commencement of the three-year limitation period." Polar Bear Prods., Inc. v. Timex Corp.,

17   384 F.3d 700, 706 (9th Cir. 2004) (holding that "[b]ecause [plaintiff] did not discover [defendant's]

18   infringement until within three years of filing suit, [plaintiff] may recover damages for infringement that

19   occurred outside of the three-year window").

20

21

22          [6] In Petrella v. Metro-Goldwyn-Mayer, Inc., the United States Supreme Court noted that
     "[a]lthough [it] ha[s] not passed on the question, nine Courts of Appeals have adopted, as an alternative
23   to the incident of injury rule, a 'discovery rule,' which starts the limitations period when 'the plaintiff
     discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'
24   " 134 S. Ct. 1962, 1979 (2014) (quoting William A. Graham Co. v. Haughey, 568 F.3d 425, 433 (3d
     Cir. 2009) (internal quotation marks omitted).  The Ninth Circuit is among those circuits to apply the
25   discovery rule in cases of alleged copyright infringement. See 2 J. Mills III, Pat. L. Fundamentals § 6:75
     (2d ed.) (noting that for purposes of 17 U.S.C. § 507(b), the discovery rule "has been explicitly adopted
26   by nine of the 13 Circuit Courts of Appeals (i.e., the First through the Ninth Circuits, inclusive)"); 6 W.
     Patry, Copyright § 20:19, p. 20–28 (2013) ("The overwhelming majority of courts use discovery accrual
27   in copyright cases.").  Accordingly, the Court here applies the discovery rule and not the incident of
     injury rule.
28

As explained in the discussion that follows, even viewing all facts in the light most favorable to plaintiffs and resolving all factual ambiguities in their favor, the Court cannot conclude *both* that plaintiffs (1) were unaware of defendants' infringement *and* (2) "reasonably could not have discovered" such infringement as far back as 2006 or 2007.  Polar Bear Prods., 384 F.3d at 706 (noting section 507(b)'s "statute of limitations does not prohibit recovery of damages incurred more than three years prior to the filing of suit if [1] the copyright plaintiff was unaware of the infringement, *and* [2] that lack of knowledge was reasonable under the circumstances.") (emphasis added); see also William A. Graham Co. v. Haughey, 568 F.3d 425, 438 (3d Cir. 2009) (In applying discovery rule to a copyright claim, "we ask whether [plaintiff] 'should have known of the basis for [her] claims [, which] depends on whether [plaintiff] had sufficient information of possible wrongdoing to place [her] on inquiry notice or to excite storm warnings of culpable activity.' ") (citation omitted).

In the more recent of her two declarations, Wolf states that it was not until November 25, 2012 that she "became aware that defendant[s] Travolta and Inclusion Films . . . were using [her] Work] without [her] permission and that Defendant Travolta was, in fact, still acting against [her] interests." Id. at ¶ 115 (emphasis added).  Wolf avers that on that date, an acquaintance informed her that Travolta was using her curriculum to gain "substantial financial benefits" through co-defendant Inclusion Films. Id.  This revelation was, in Wolf's view, "the first time that [she] learned that Defendant Travolta was, in fact, wrongfully using [her] Work."  Id.

However, Wolf's own testimony establishes that in mid-to-late 2006, she "suspected Defendant Travolta had merely *changed the cover sheet to [her] program design*" and submitted it to the Center. Id. at ¶ 99 (emphasis added).  Indeed, Wolf states that on December 4, 2006, she "informed the [AFA] Board . . . of [her] concerns about Defendant Travolta using [her] program without permission, and the advice [that attorney Shannon Nash] gave [her] indicating that, although I [Wolf] thought *it seemed clear that Defendant Travolta was using the program*, more evidence was needed before any legal action" could be commenced.  Id. at ¶ 108 (emphasis added).  The December 2006 letter that Wolf received shortly thereafter from the Center further stated, in fairly unequivocal terms, that the Center

/ / /

/ / /

18

1  "[had] been working with Joey Travolta to develop . . . *a program identical to your proposed program*."

2  Gebelin Decl., Ex. H (emphasis added).[7]

3       Wolf nonetheless contends that even though she had strong suspicions of defendants'

4  infringement in late 2006, she exercised due diligence at the time by initiating "[her] own independent

5  investigation" and thereby taking "reasonable steps to find out if, in fact, Defendant Travolta was using

6  [her] program without [her] permission."  Wolf Decl. II at ¶¶ 110-11.  Thus, "having found no direct

7  or circumstantial evidence *proving* [Travolta] was [infringing], [Wolf] thought there was no 'grounds'

8  to pursue legal action at that time."  Id. (empahsi added).  Plaintiff's "reasonable" investigation of her

9  suspicions essentially involved confronting Travolta, his associate Richard Bluth, and Karen Ingram of

10  the Center and asking them whether they had infringed upon her copyright by using her underlying

11  works.  See Wolf Decl. II  at ¶ 110.  According to Wolf, all three denied that they had used Wolf's

12  works, insisting instead that they were working to "develop a different film program."  Wolf Decl. II

13  at ¶ 110; see also PS at ¶ 48 (stating that "despite [Wolf's] efforts to learn [of the alleged infringement

14  at the time], all of [her] suspicions disappeared regarding [Travolta's] copying [of] her practical

15  filmmaking program . . . .").  Wolf contends that in making such denials, these individuals "concealed

16  facts from [her] that would have informed her of acts and injury triggering the running of all statute[s]

17  of limitations."  Opp'n at 14.  Plaintiff accordingly contends that such conduct constituted "fraudulent

18  concealment" warranting equitable tolling of the statute of limitations.  Id.  The Court disagrees.

19       Generally speaking, the doctrine of fraudulent concealment "is invoked only if the plaintiff both

20  pleads and proves that the defendant *actively* misled her, and that she had neither actual nor constructive

21  knowledge *of the facts constituting his cause of action* despite her due diligence."  Grimmett v. Brown,

22  75 F.3d 506, 514 (9th Cir. 1996) (emphasis in original) (citing Volk v. D.A. Davidson & Co., 816 F.2d

23  1406, 1415 (9th Cir. 1987) ("The doctrine [of fraudulent concealment] is properly invoked only if a

24  plaintiff establishes 'affirmative conduct upon the part of the defendant which would, under the

25

26     [7] Plaintiffs contend that "there is a significant difference between 'developing' an unspecified 'program' and Defendants actually copying Dr. Wolf's works and submitting them in the vendorization

27  process."  Opp'n at 13.  Even if the Court were to recognize such a distinction, this would not warrant a different result here, as Wolf repeatedly states that she suspected Travolta was in fact using *her*

28  specific program design materials.  See Wolf Decl. II at ¶ 99

1  circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief.'
2  ") (citation omitted); see also Gypsum, 55 F.3d at 1409 n. 12 (noting that evidence of defendant's
3  misrepresentations was irrelevant because plaintiff was on notice of a potential claim). Crucially for
4  purposes of the Court's analysis here, a defendant's "failure to 'own up' [to the alleged wrongdoing]
5  does not constitute *active* concealment." Grimmett, 75 F.3d at 515 (emphasis in original).

6      The Ninth Circuit's decision in Grimmett v. Brown, a case outside the context of copyright law,
7  is instructive. The plaintiff in Grimmett argued that her RICO cause of action should have been tolled
8  until December 1990, when she first learned that her injuries were part of a pattern of racketeering
9  activity. Id. at 511. Specifically, plaintiff argued that until that point in time, the defendant had
10  fraudulently concealed her activity by "perjur[ing] herself in depositions and other correspondence to
11  insure that [plaintiff] never learned of the [offending conduct]." Id. The Ninth Circuit rejected
12  plaintiff's argument that such conduct constituted fraudulent concealment, as plaintiff "set[] forth no
13  proof of [defendant's] active concealment of the reorganization scheme." Id. "At most," the court
14  explained, defendant "failed to 'own up' to her illegal conduct." Id. In many respects, this failure to
15  "own up" mirrors purported denials by Ingram, Bluth, and defendant Travolta as to any wrongdoing.[8]
16  See Wolf Decl. II at ¶ 110 (detailing these alleged denials). Thus, as in Grimmett, plaintiff Alisa Wolf
17  "had available all the facts necessary to discover her cause of action with due diligence. The limitations
18  period does not toll simply because a party is ignorant of her cause of action."[9] Id.; see also Volk, 816

19  _____

20  [8] The Court notes that Travolta denies that Wolf ever approached him in 2007 to ask whether
21  he was using any of her works. See Dkt. 146-1 (December 25, 2015 Declaration of Joseph "Joey"
    Travolta ("Travolta Decl. II")) at ¶¶ 5-6. Travolta further denies that he ever made any representations
22  or gave Wolf any assurances that he was not using program materials that she created (i.e., the
    copyrighted works that are the subject of this litigation). Id. In granting the instant motion, the Court
23  resolves such factual disputes and ambiguities in favor of plaintiffs (as the non-moving parties).

24  [9] To the extent Wolf argues that the statute of limitations should be tolled due to the legal advice
25  she received from AFA's attorney, Shannon Nash, the Court rejects this argument. According to Wolf,
    Nash advised her that she "should not file a frivolous lawsuit," but "if [she] could find evidence and
26  proof, [she] could file a lawsuit against Defendant Travolta for taking [her] program." Wolf Decl. II
    at ¶ 107. Wolf further avers that at the time she "thought it seemed clear that Defendant Travolta was
27  using the program," but Nash nonetheless advised her—seemingly without reference to the risks
    associated with delay—that "more evidence was needed before any legal action" could be taken. Id.
28  at ¶ 108. The fact that Nash, in her capacity as counsel to AFA, did not apprise AFA or Wolf of the

F.2d at 1416 ("Once appellants had clear knowledge of their claims, it was not reasonable for them to rely on reassuring comments from a broker [employed by defendant].").

Plaintiffs' opposition cites only one case, Prather v. Neva Paperbacks, Inc., 446 F.2d 338, (5th Cir. 1971), in which a court specifically considered whether fraudulent concealment tolled the statute of limitations imposed by section 507(b).[10]  See Opp'n at 14.  However, Prather also militates in favor of finding that defendants' alleged concealment does not toll the statute of limitations in the instant case. In Prather, the plaintiff's "only alleged excuse" for failing timely to file a suit was that he was "ignorant" of his copyright infringement claim because the defendants "concealed from him the existence of [an allegedly infringing book] and prevented him from obtaining a copy of that book."  Prather, 446 F.2d at 340 (noting that the facts of such concealment were undisputed).  Essentially, the plaintiff "suspected that he had a cause of action, but could not prove the infringement without the book." Id. at 341.  "Such a showing," the Fifth Circuit explained, "is insufficient to toll the statute of limitations." Id.  As the court further explained:

---

need timely to litigate such an action upon actual or constructive notice of infringement does not constitute grounds for tolling the statute of limitations.  See Booth v. Carnival Corp., 522 F.3d 1148 (11th Cir. 2008) ("[A]ttorney's simple neglect could not justify equitably tolling the applicable limitation period.") (citing Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) (declining to toll statute of limitations on plaintiff's Title VII claim due to "what is at best a garden variety claim of excusable neglect" on the part of plaintiff's attorney); cf. Fahmy v. Jay-Z, 835 F. Supp. 2d 783, 791 (C.D. Cal. 2011) ("Plaintiff . . . may not rely on alleged misrepresentations from his own agents . . . to toll the statute [of limitations] . . . .").

[10] Plaintiffs' supplemental brief cites additional cases involving alleged fraudulent concealment, including the opinion of Judge Posner in Taylor v. Meirick, 712 F.2d 1112 (7th Cir. 1983).  In Taylor, Judge Posner explained that "[a]lthough many cases state that mere ignorance of a cause of action does not toll the statute of limitations, in context these statements invariably mean only that the plaintiff has a duty of diligence: it is not enough that *he* did not discover he had a cause of action, if a reasonable man in his shoes would have." Id. at 1118 (emphasis in original).  The Taylor court further concluded that "fraudulent concealment" occurred where the defendant placed a copyright notice bearing his own name on copies of plaintiff's work. Id.  "This [finding], however, is probably limited to the circumstances where, as in Taylor, only a close inspection would have revealed the infringement because the features in plaintiff's work that were copyrightable 'were subtle and would easily escape notice with another's name affixed as copyright holder.' " 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.05 (2015) (quoting Taylor, 712 F.2d at 1118).  This is not the case here, where defendants placed no such copyright notice on their program design and their alleged infringement, as described by plaintiffs, was not "subtle."

1  [W]e conclude that the mere fact that plaintiff was unable to procure a

2  copy of the book is insufficient to show the successful concealment

3  necessary to toll the statute of limitations.  This was *merely ignorance of*

4  *evidence, not ignorance of a potential claim*.  The appellant knew of the

5  alleged infringement, but did not have in his possession the precise

6  minutiae of the plagiarism.  The bells do not toll the limitations statute

7  while one ferrets the facts.  Consequently, the plaintiff did not allege

8  facts which if true would justify tolling the statute of limitations.  The

9  district court was therefore correct in granting summary judgment . . . .

10

11  Prather, 446 F.2d at 341.

12      In the instant case, much as in Prather, Wolf states that she "thought there was no 'grounds' to

13  pursue legal action" because she "found no evidence that [Travolta] was using [her] program without

14  [her] permission" and was expressly told by Travolta himself that he did not use her works.  Wolf. Decl.

15  at ¶ 111.  Again, this "mere[] ignorance of evidence" is "not ignorance of a *potential* claim."  Prather,

16  446 F.2d at 341 (emphasis added).  Nor is the alleged infringer's denial of wrongdoing sufficient to

17  constitute fraudulent concealment or otherwise sufficient to render Wolf's purported inability to

18  discover the infringement reasonable under the circumstances.[11]  See Grimmett, 75 F.3d at 515.  This

19  ────────────────

20      [11] The Court notes that plaintiffs' reliance upon the Third Circuit's decision in William A.

21  Graham Co. v. Haughey, 568 F.3d 425 (3d Cir. 2009) is also unavailing.  In Haughey, the Third Circuit
   explained that "the first step in applying the discovery rule . . . is to establish when the injurious . . . act

22  defined by the statute actually occurred."  Id. at 438 (citation omitted).  With this principle in mind, the
   Third Circuit reversed the district court's granting of summary judgment in favor of defendant,

23  explaining that "the storm warnings relied upon by the District Court [in granting summary judgment
   on the statute of limitations issue] *predated the first act of infringement*."  Id. (emphasis added).  As the

24  court explained, because "a potential plaintiff cannot discover his injury before it has occurred, the
   discovery rule only postpones the accrual date of a claim where the plaintiff is unaware of the injury"

25  and "does not *accelerate* the accrual date when the plaintiff becomes aware that he will suffer injury in
   the future."  Id. (emphasis in original).  Here, in contrast to Haughey, the relevant "storm warnings"

26  *followed* defendants' first alleged infringement of her rights to the works at issue in this case.
   Furthermore, as described *supra*, the relevant "storm warnings" were fairly specific and not merely

27  based upon a generalized belief that defendant Travolta was a purported "bad actor."  Id. at 440 (noting

28  that "inquiry notice demands more than evidence that a person is a bad actor in some general sense

22

1    is particularly so where, as here, Wolf was expressly advised in December 2006 by the Center that

2    Travolta had been working to develop a program that was "identical to her program."  Wolf Decl. II at

3    ¶ 98.

4        As the Ninth Circuit has explained, fraudulent concealment "requires a showing both that the

5    defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the

6    plaintiff was, in fact, *ignorant of the existence of his cause of action*. [Here, plaintiff] has made no

7    showing to prove the first prong of this test and has [arguably] disproven the second [prong]" through

8    her own testimony regarding her decision not to file suit in 2006 or 2007.[12]  Wood v. Santa Barbara

9    Chamber of Commerce, Inc., 705 F.2d 1515, 1521 (9th Cir. 1983) (emphasis added).  Again, plaintiff

10   herself has stated that it "seemed clear [to her in 2006] that Defendant Travolta was using the

11   program"—i.e, that Travolta "had merely changed the cover sheet to [her] program design" and

12   submitted it to the Center.  Wolf Decl. II at ¶¶ 99, 108.  Rather than sue at the time, the AFA Board

13   "agreed that [Wolf] should write a different program design," in part because they did not want the "bad

14   press" that might have accompanied such a suit.  Id. at ¶ 108.

15       Ultimately, therefore, the Court cannot conclude that plaintiffs *both* (1) did not discover *and* (2)

16   reasonably could not have discovered defendants' alleged infringement before November 2012.  Polar

17   Bear Prods., 384 F.3d at 706; see also William A. Graham Co. v. Haughey, 568 F.3d 425, 438 (3d Cir.

18   ――――――――――

19   before a court can conclude that a storm warning exists as to a specific cause of action").

20       [12] The Ninth Circuit's decision in Wood v. Santa Barbara Chamber of Commerce, Inc., 705 F.2d
21   1515 (9th Cir. 1983) is instructive.  The plaintiff in Wood had, through his initiation of an earlier suit,
     "indicated his suspicion that at least one of his photographs had been infringed" by defendants.  Id. at
22   1521.  "That suspicion placed upon [the plaintiff] a duty to investigate further into possible
     infringements of his copyrights"—which the plaintiff failed to do in that case.  Id.  But regardless of
23   whether or not the plaintiff conducted any such investigation, the Ninth Circuit explained that "equity
     will impute to a litigant knowledge of facts that would have been revealed by reasonably required
24   further investigation."  Id.  In Wood, the court "h[e]ld as a matter of law that [the plaintiff] should
     reasonably have discovered the allegedly infringing use of those photographs" at issue in the case, and
25   that "[n]o rational jury would, on the[] narrow facts [of the case], fail to find that a reasonable litigant
     should have investigated *and would have discovered the potential causes of action underlying this*
26   *lawsuit*."  Id. (emphasis added).  In the instant case, the Court similarly finds—to the extent plaintiff
27   argues she did not have actual knowledge of a potential claim—that no rational trier of fact would find
     that plaintiff reasonably could not have discovered Travolta's alleged infringement well before 2012.

28

2009) (noting that if defendants demonstrate plaintiff "had sufficient information of possible wrongdoing to place [her] on inquiry notice or to excite storm warnings of culpable activity," then "the burden shifts to [plaintiff] to show that [she] exercised reasonable due diligence and yet [was] unable to discover [her] injuries").  Accordingly, any damages to be awarded for plaintiffs' two copyright infringement claims must arise from acts of infringement that accrued in the three years preceding her assertion of these claims—i.e., damages must be limited to those stemming from infringement of the first work that post-dates February 6, 2011, and infringement of the second work that post-dates August 5, 2012.

ii.     **Evidence of Infringement Accruing within the Three-year Statute of Limitations**

As the Supreme Court explained in Petrella, "when a defendant has engaged (or is alleged to have engaged) in a series of discrete infringing acts, the copyright holder's suit ordinarily will be timely under § 507(b) with respect to more recent acts of infringement (i.e., acts within the three-year window), but untimely with respect to prior acts of the same or similar kind." Petrella, 134 S. Ct. at 1970.  In a revised tentative order provided to the parties, the Court noted that neither party had referenced testimony or other evidence in the record regarding alleged copyright infringement occurring within the three-year statute of limitations—i.e., between February 6, 2011 and February 6, 2014 for plaintiff's May 2006 Work, or between August 5, 2012 and August 5, 2015 for plaintiff's September 2006 Work. Accordingly, because "[d]istrict courts unquestionably possess the power to enter summary judgment sua sponte, even on the eve of trial," the Court notified the parties that it was inclined, on its own motion, to grant summary judgment in favor of defendants as to the entirety of plaintiffs' two copyright claims. Norse v. City of Santa Cruz, 629 F.3d 966, 971 (9th Cir. 2010) (en banc); see also Fed. R. Civ. P. 56(f)(3) ("After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.").  The Court requested supplemental evidence and briefing to assess whether a genuine dispute of material fact existed regarding alleged acts of infringement post-dating February 6, 2011. Dkt. 183.

In response, plaintiffs filed a supplemental brief that largely rehashes arguments made in opposition to the instant motion.  See P's Supp. Brief at 2-15.  Plaintiffs also provided three additional

documents that were produced by various non-party regional centers in response to a subpoena: (1) a revised version of defendants' program design, dated April 19, 2011, that was produced by the Westside Regional Center (which apparently is not related to Travolta); (2) what appears to be a significantly modified version of defendants' allegedly infringing program design, dated July 28, 2014, that was produced by the Alta Regional Center (which apparently is not related to Travolta); and (3) a copy of defendants' program design, dated February 4, 2008, that appears to have been faxed to an unknown entity by the Lanterman Regional Center on November 16, 2011, based on a time stamp on the document.  See Dkt. 184-1.  Plaintiffs argue these documents demonstrate that "[d]efendants, either through themselves or through the [Lanterman Regional Center], were distributing copies of their infringing program design to the other regional centers between 2011 and 2014."  P's Supp. Brief at 2. In support of this contention, plaintiffs do not cite any testimony from defendants or the regional centers themselves.  Rather, plaintiffs cite only to a supplemental declaration of their attorney in which he makes conclusory statements regarding defendants' purported distribution of these three documents. See Dkt. 184-1 (Chisvin Supp. Decl.) at ¶¶ 2 (stating document "was copied and distributed in 2011 as it states 'DRAFT UPDATED: April 19, 2011' "), 3 (stating document "was copied and distributed in 2014, as it is dated 'July 28, 2014' "), 5 (stating document "was copied and distributed in 2011, as it was faxed by [the Lanterman Regional Center] on November 16, 2011.").

In response, defendants contend that they did not instruct any third-party regional centers to distribute copies of the allegedly infringing program design and generally had no control over regional centers' decisions to send copies of the program service designs.  See D's Supp. Brief.  Defendants also object to the declaration of plaintiffs' attorney, arguing that he provides no basis for his personal knowledge regarding who created or distributed the supplemental documents.  Dkt. 186 (citing Fed. R. Evid. 602, 800, et seq.).  In a supplemental declaration, Travolta avers that neither he, defendant Inclusion Wear, LLC, nor defendant Little Documentary Films had any control over the decisions of any regional centers to send copies of program service designs to other regional centers.  Dkt. 185-1, Travolta Suppl. Decl. at ¶ 4.  Rather, Travolta avers that the main version of the allegedly infringing

/ / /

/ / /

1  program service guide was published on the Inclusion Films website in or about April 2010, "where it

2  remained without substantial revisions until it was removed in response to this litigation."[13]  Id. at ¶ 6.

3  Crucially, a defendant is only liable for "*his* acts of infringement committed within three years

4  prior to [a plaintiff's] lawsuit." Makedwde Publ'g Co. v. Johnson, 37 F.3d 180, 181 (5th Cir. 1994) ("We

5  are persuaded by the Ninth, Sixth, and Second Circuits' interpretation of section 507(b)"); see also Kling

6  v. Hallmark Cards, Inc., 225 F.3d 1030, 1038 (9th Cir. 2000) ("[T]he [copyright] statute of limitations

7  is triggered only by violations—i.e., actual infringements.").   At the summary judgment stage,

8  "judgment 'shall be entered' against the nonmoving party unless affidavits or other evidence 'set forth

9  specific facts showing that there is a genuine issue for trial.' " Lujan, 497 U.S. at 888 (citing Fed. R.

10  Civ. P. 56).  The object of this standard "is not to replace conclusory allegations of [a] complaint or

11  answer with conclusory allegations of an affidavit . . . Rather, the purpose of Rule 56 is to enable a party

12  who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand

13  at least one sworn averment of that fact before the lengthy process of litigation continues." Id. at 888-

14  89.  The conclusory and unsubstantiated assertions in the declaration of plaintiffs' attorney—coupled

15

16  [13] The fact that the allegedly infringing document—published in 2010, outside the relevant three-
17  year window—*remained* on defendant's website through 2014 does not give rise to a discrete claim
    accruing within the three-year window.   The Court in Petrella "specifically distinguish[ed] the
18  separate-accrual rule established in § 507(b) from the 'continuing violation' doctrine." Chicago Bldg.
    Design, P.C. v. Mongolian House, Inc., 770 F.3d 610, 615 (7th Cir. 2014) (citing Petrella, 134 S. Ct.
19  at 1969).  Under the separate accrual rule, "when a defendant commits successive violations, the statute
    of limitations runs separately from each violation.  Each time an infringing work is reproduced or
20  distributed, the infringer commits a new wrong.  Each wrong gives rise to a discrete 'claim' that
    'accrue[s]' at the time the wrong occurs." Petrella, 134 S. Ct. at 1969 (citation omitted).  However, the
21  Court in Petrella cautioned that such "[s]eparately accruing harm should not be confused with *harm from
    past violations that are continuing*." Id. at 1969 n. 6 (emphasis added); Compare Klehr v. A.O. Smith
22  Corp., 521 U.S. 179, 190 (1997) (for separately accruing harm, each new act must cause "harm [to the
    plaintiff] over and above the harm that the earlier acts caused"), with Havens Realty Corp. v. Coleman,
23  455 U.S. 363, 380-81 (1982) ("[W]here a plaintiff . . . challenges . . . an unlawful practice that continues
24  into the limitations period, the complaint is timely when it is filed within [the limitations period,
    measured from] the last asserted occurrence of that practice.") (footnote omitted).  Thus, in the instant
25  case, the allegedly infringing document's continued presence on defendants' website through 2014 at
    best constitutes "harm from [a] past violation[] that [was] continuing" through 2014, and not a "new
26  wrong" that gave rise to "[s]eparately accruing harm" within the limitations period. Petrella, 134 S. Ct.
27  at 1969, 1969 n. 6.  Plaintiffs have failed to produce admissible evidence creating a genuine dispute of
    material fact regarding whether "the [alleged] infringer commit[ted] a new wrong" by reproducing or
28  distributing the infringing work within three years of the initiation of this suit. Id. at 1969.

with unauthenticated and largely unexplained documentation produced by third-parties—does not suffice to defeat summary judgment here.  Although two of plaintiffs' proffered documents are dated April 19, 2011 and July 28, 2014, respectively—dates *within* the relevant three-year statute of limitations—the documents were produced by third-party regional centers without any indication as to whether *defendants* themselves created, edited, or distributed the documents.  See Dkt. 184-1.  The third of these documents is dated February 4, 2008 and contains a time stamp indicating that it was faxed by the Lanterman Regional Center on November 16, 2011.  Id.  Again, even if the Center, which is not party to this suit, may have faxed an older version of defendants' allegedly infringing program, this does not generate a genuine dispute regarding whether *defendants themselves* engaged in acts of infringement after February 6, 2011.

Accordingly, because the Court finds that plaintiffs have failed to cite admissible evidence in the record that creates a genuine dispute as to material facts regarding alleged infringement by *defendants* within the relevant three-year window, the Court concludes that summary judgment in favor of defendants as to plaintiffs' copyright claims is warranted.  See Roley, 19 F.3d at 481-82 (explaining that in "case[s] of continuing copyright infringement[], an action may be brought for all acts that accrued within the three years preceding the filing of the suit," but concluding that plaintiff "fail[ed] to produce any evidence that appellees engaged in actionable conduct [in the three-year window]," producing instead only "naked allegations and speculation" and consequently "fail[ing] to demonstrate that either a genuine issue of material fact exists, or that the district court incorrectly applied the relevant law").

### 3.    Plaintiffs' State Law Claims

It is undisputed that plaintiffs' five state law claims stem from conduct that began in 2006, in the wake of defendant Travolta's resignation from Actors for Autism—specifically, Travolta's allegedly unlawful appropriation in 2006 of plaintiffs' copyrighted works and defendants' interference with plaintiffs' existing and future economic relationships in the years following the alleged misappropriation.[14]  Indeed, based upon the operative complaint's allegations and the relevant statutes

---

[14]  See DS at ¶¶ 23-24; PS at ¶¶ 23-24 (undisputed that plaintiffs' UCL claim is "based on the alleged infringement and exploitation of the works set forth in the first and second causes of action and also of unspecified trade secrets"; and further undisputed that plaintiffs' fourth claim for interference

of limitation—all of which, as discussed *infra*, are four years or less—plaintiffs' state law claims all appear to be time barred, as each is premised upon conduct and resulting harm that first occurred seven or eights years before the filing of the instant action.  Therefore, defendants argue that all of plaintiffs' state law claims, which were first asserted on September 29, 2014, <u>see</u> dkt. 39, are barred by the applicable statutes of limitation.

Although plaintiffs concede that the state law claims stem from Travolta's conduct in the wake of his 2006 resignation from AFA, plaintiffs nonetheless contend these claims are not time barred because Wolf did not know that Travolta "unlawfully took property belonging to AFA" until November 2012, in part due to defendants' purported fraudulent concealment.  Opp'n at 15.  Applying the delayed discovery rule, plaintiffs contend that although the conduct underlying their claims began in 2006, the statutes of limitation were not triggered until 2012, such that plaintiffs' assertion of these claims in 2014 permits recovery for damages as far back as 2006.  In the alternative, plaintiffs appear to suggest—albeit without any supporting authority—that either the continuing violation doctrine or the related theory of continuous accrual apply and therefore preclude summary judgment.  <u>See</u> Opp'n at 16.  The Court addresses the merits of these arguments in the discussion that follows.

### i.   Allegations of State Law Claims in the Fourth Amended Complaint

Plaintiffs assert state law claims for misappropriation of trade secrets, conversion, interference with economic relationships, breach of fiduciary duty, and violation of the UCL.  <u>See generally</u> FAC. Plaintiffs' misappropriation and conversion claims are closely related: plaintiffs' conversion claim alleges that "[u]pon his resignation from AFA [in 2006]," Travolta "intentionally and substantially

---

with economic relationships is "based on the same alleged infringement and exploitation of the works and unspecified trade secrets"); DS at ¶ 25; PS at ¶ 25 (undisputed that plaintiffs' fifth claim "is based on allegations of [Travolta's] Breach of Fiduciary Duty . . . for his alleged taking of business opportunities that allegedly belonged to AFA, information that belonged to Wolf, and his use of knowledge gained while on the board of directors of AFA in competition with Plaintiffs"); DS at ¶ 26; PS at ¶ 26 (undisputed that plaintiffs' sixth claim "is based on allegations of Misappropriation of Trade Secrets comprised of the registered works, client lists, and business strategies held by Plaintiffs at the time that Travolta left his association with AFA"); DS at ¶ 27; PS at ¶ 27 (undisputed that plaintiffs' seventh claim "is based on allegations of Conversion of physical property, intangible (intellectual) property and/or ideas allegedly belonging to Plaintiffs at the time that Travolta left his association with AFA").

interfered with Plaintiffs' property by taking possession of their assets and converting such assets to Defendants' own use and benefit." FAC at ¶ 179.  More specifically, defendants purportedly converted plaintiffs' "computer equipment, computer files[] and the intellectual property contained [therein], confidential information, client lists, business strategies, and trade secrets, all of which constitute plaintiffs's assets." Id. at ¶ 176. Similarly, plaintiffs' claim for misappropriation of trade secrets alleges that "upon his resignation [in 2006]," Travolta "took [plaintiffs' trade secrets] without permission," including "copyrighted work[s], business strategies, and client lists." Id. at ¶¶ 159, 162.

Plaintiffs' claim for interference with economic relationships alleges that Travolta interfered with Wolf's existing and prospective economic relationships with regional centers. Id. at ¶126.  In purportedly disrupting plaintiffs' economic relationships, Travolta is alleged to have "[w]rongfully used Dr. Wolf's confidential information that [he] was provided in confidence" in or around 2006, including "program vendorization information, potential clients, California regional centers information, and editable draft of Dr. Wolf's copyrighted work." Id. Plaintiffs' breach of fiduciary duty claim alleges that "[a]s President and board member of AFA, Defendant Travolta had fiduciary duties to Dr. Wolf and AFA," including, *inter alia*, duties of undivided loyalty, good faith, confidentiality, reasonable care, and a duty to refrain from using his position for his own benefit and to the detriment of AFA. Id. at ¶ 139. Plaintiffs thus allege that Travolta's use of plaintiffs' "copyrighted work, business strategies, and client lists" constitutes a breach of his fiduciary duties. Id. at ¶ 144.  Finally, plaintiffs' UCL claim is premised upon defendants' "unfair, deceptive, and fraudulent" (1) misappropriation and misuse of plaintiffs' copyrighted works, (2) improper diversion of and interference with plaintiffs' business relationships, and (3) false and misleading representations about Wolf and her work. See, e.g., id. at ¶¶ 109, 110, 113.

### ii.    Applicability of the Discovery Rule

As with the foregoing analysis regarding accrual of copyright claims, an important exception under California law to the "general rule for defining the accrual of a cause of action—indeed, the 'most important' [exception]—is the discovery rule," which "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." Norgart, 21 Cal. 4th at 397 (citation omitted).  The discovery rule does not require "absolute certainty" for a cause of action to accrue. See

1   Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807 (2005). Rather, "suspicion of one or more of

2   the elements of a cause of action, coupled with knowledge of any remaining elements, will generally

3   trigger the statute of limitations period." Id. In this context, "elements" refers not to the specific legal

4   elements of the particular cause of action at bar, but rather to the " 'generic' elements of [1] wrongdoing,

5   [2] causation, and [3] harm." Id. (quoting Norgart, 21 Cal. 4th at 397). Thus, the Court "do[es] not take

6   a hypertechnical approach to the application of the discovery rule," but rather "look[s] to whether the

7   plaintiffs ha[d] reason *to at least suspect* that a type of wrongdoing ha[d] injured them." Id. (emphasis

8   added). Stated differently, "[o]nce the plaintiff has a suspicion of wrongdoing, and therefore an

9   incentive to sue, she must decide whether to file suit or sit on her rights." Jolly v. Eli Lilly & Co., 44

10  Cal.3d 1103, 1111 (1988).

11      As explained *supra*, Wolf avers that first "became aware" or "learned" that Travolta was using

12  her works without her permission on November 25, 2012. Wolf Decl. at ¶ 115. Crucially, however,

13  under California law, "[s]o long as a *suspicion* exists, it is clear that the plaintiff must go find the facts;

14  she cannot wait for the facts to find her." Jolly, 44 Cal. 3d at 1110 (emphasis added). Wolf's

15  declaration specifically details her early suspicions or express notice regarding the wrongdoing and

16  resulting harm giving rise to the operative complaint's various tort claims. Specifically, Wolf asserts

17  that "*in 2006*, [she] first suspected that Defendant Travolta was *interfering with . . . contracts* that were

18  being sought after by Actors for Autism." Wolf Decl. II at ¶ 101 (emphasis added). "For example,"

19  Wolf continues, Travolta "*breached his fiduciary duties*" before he resigned from Actors for Autism

20  when he convinced a San Mateo-based center for autism spectrum disorders "to change the name on a

21  two week film-making summer camp." Id. at ¶ 102. Travolta also "interfered with [Wolf's] business

22  relations again when Actors for Autism sought another . . . contract with Oakland University." Id. at

23  ¶ 103. Before he left AFA's Board, Travolta had also charged and requested reimbursement from AFA

24  for "unauthorized expenses, such as purchases from Sport Chalet, Costco, Party Corner, Lowe's, Jo-Ann

25  Fabrics and Crafts, Michaels, and Gelson's." Wolf Decl. II at ¶ 91. Accordingly, on or about July 11,

26  2006, Travolta was asked to resign as President of Actors for Autism "due to his indiscretions," as the

27  AFA Board "felt [at the time] that they could not discuss any prospective business contacts or programs,

28  in fear that Defendant Travolta would steal them." Wolf Decl. II at ¶ 90.

Furthermore, Wolf avers that during a December 4, 2006 Board meeting, she "thought it seemed clear that Defendant Travolta was using the program," and accordingly "informed the [AFA] Board . . . of [her] concerns about Defendant Travolta using [her] program without permission."  Wolf Decl. II ¶ 108.  To the extent Wolf is now arguing that she did not suspect at the time that Travolta had actually retained any copies of her underlying works, any such assertion is belied by Wolf's own testimony.  Specifically, Wolf asserts that when she learned that the Center was working with Travolta to develop a program "identical to [her own] proposed program," she "suspected Defendant Travolta had merely changed the cover sheet to [her] program design"—i.e., that he had retained a copy of her work and misrepresented it as his own.  Wolf Decl. II at ¶ 99.

Wolf's letter of appeal to the Center, dated January 23, 2007, further reveals her suspicions regarding the conduct underlying her five state law claims:

> When the [Actors For Autism] film program was submitted to you [i.e., the Center] and approved, Joey Travolta was the President of our organization and the liaison between Lanterman Regional Center and Actors for Autism.  Mr. Travolta resigned as a board member [o]n July 11th of 2006.  As a result of his resignation he no longer represented the organization and any further conversations regarding this program should have ceased.

> All documents that I submitted to you regarding the film program are copy written [*sic*] by me and registered with the U.S. State Department [*sic*].

> California Non-Profit law is very specific stating that any and all concepts, programs and services which are developed under a public charity belong to the charity.  Further, *a board member may not take an idea, concept, program or service for personal gain*.

31

> Mr. Travolta *broke his fiduciary duty when he continued to have conversations with Lanterman Regional Center about our program for his own personal gain*.

Wolf Decl. II at ¶ 109.

As with plaintiff's copyright claims, discussed *supra*, the fact that Wolf's "independent investigation" purportedly produced no "direct or circumstantial evidence proving" Travolta's wrongdoing does not justify tolling of the relevant statutes of limitation. Wolf Decl. II at ¶ 111 (noting that plaintiff "thought there was no 'grounds' to pursue legal action at that time"). "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim [in order for the claim to accrue]; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights." Jolly, 44 Cal. 3d at 1110. In the instant case, despite her suspicions and her own independent investigation, plaintiff chose to "sit on her rights" rather than act upon her "incentive to sue" in 2006 or 2007. See id.; c.f. Miller v. Bechtel Corp., 33 Cal. 3d 868, 875 (1983) ("Since plaintiff's representatives chose not to pursue their inquiry further despite their suspicions, [plaintiff] is charged with knowledge of facts which would have been revealed if she had pursued the investigation. . . . [W]e cannot assume that such an inquiry would have been unavailing.").

Accordingly, the Court concludes that even under the discovery rule, all of plaintiffs' state law claims accrued no later than early 2007. Therefore, all of these claims would be time barred, unless plaintiffs can demonstrate the applicability of an alternative equitable ground for denying defendants' motion.

### iii.  Applicability of the Continuing Violation Doctrine and Continuous Accrual Theory

In addition to arguing applicability of the discovery rule, plaintiffs' opposition makes cursory reference to additional grounds for finding an equitable exception to the running of the statute of limitations.. See Opp'n at 14-15 (noting the fact that "California courts have developed a handful of equitable exceptions to and modifications of the usual rules governing limitations periods"). The Court

construes plaintiffs' reference to unspecified "equitable exceptions" as seeking to invoke either the continuing violation doctrine or the theory of continuous accrual.  See FAC at ¶¶ 107 (UCL claim), 124 (interference with economic relationships claim), 138 (breach of fiduciary duty claim) (alleging that defendants' "continuous acts and omissions constitute a 'continuous course of conduct' and, under the 'accrual theory,' each of Defendant[s'] acts and omissions constitutes a separate, recurring invasion of Plaintiffs' rights which, thereby, triggers a separate and distinct statute of limitations period").

The continuing violation doctrine "aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them."  Aryeh v. Canon Bus. Solutions, Inc., 55 Cal. 4th 1185, 1192 (2013) (citation omitted).  As the California Supreme Court recently explained,

> Some injuries are the product of a series of small harms, any one of which may not be actionable on its own.  Those injured in such a fashion should not be handicapped by the inability to identify with certainty when harm has occurred or has risen to a level sufficient to warrant action . . . Allegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period.

Id. at 1198.  However, the continuing violation doctrine has little applicability where, as here, plaintiffs allege "a series of discrete, *independently actionable* alleged wrongs," such that it is not necessary for a series of harms to accumulate before the alleged wrongdoing becomes apparent and actionable.  Id.

Under the related but distinct theory of continuous accrual, "a series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events"—like those occurring in 2006 or 2007—"but timely as to those within the applicable limitations period."  Id.  at 1192.  Thus, "unlike the continuing violation doctrine, which renders an entire course of conduct actionable, the theory of continuous accrual supports recovery only

33

for damages arising from those breaches falling within the limitations period." Id. at 1199.  Generally speaking, "continuous accrual applies *whenever there is a continuing or recurring obligation*: 'When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period.' " Id. (citation omitted) (emphasis added).  Because each new breach of such an obligation "provides all the elements of a claim—wrongdoing, harm, and causation—each may be treated as an independently actionable wrong with its own time limit for recovery." Id. (citation omitted).  Accordingly, "California courts have held that disputes regarding monthly billing and payments qualify for continuous accrual, with each month triggering a new limitations period." Ryan v. Microsoft Corp., — F. Supp. 3d.—, 2015 WL 7429495, at *21 (N.D. Cal. Nov. 23, 2015) (Koh, J.) (citing Aryeh, 55 Cal.4th at 1200 (defendant's "duty not to impose unfair charges in monthly bills" was "a continuing one"); Tsemetzin v. Coast Fed'l Sav. & Loan Ass'n, 57 Cal. App. 4th 1334, 1344 (1997) (periodic monthly rent payments owed were a recurring obligation); Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co., 116 Cal. App. 4th 1375, 1388-89 (2004) (monthly payments on a gas and oil lease created a recurring obligation)).

Thus, for continuous accrual to apply to a particular claim here, defendants' wrongful conduct within the relevant limitation period must have violated a particular "continuing or recurring obligation" to plaintiffs, such that a more recent breach of that obligation "may be treated as an independently actionable wrong with its own time limit for recovery." Aryeh, 55 Cal. 4th at 1199 (citations omitted). With these principles in mind, the Court turns to the potential applicability of the continuous accrual theory to each of plaintiffs' state law claims for relief.

### a.     Continuous Accrual and Misappropriation of Trade Secrets

The theory of continuous accrual in inapplicable to plaintiffs' claims for misappropriation of trade secrets.  Under section 3426.6 of the California Civil Code, an action for misappropriation "must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered"—more importantly, "a continuing misappropriation constitutes a single claim." Cal. Civ. Code § 3426.6.  Interpreting this provision, the California Supreme Court has held that "the continued improper use or disclosure of a trade secret after defendant's initial misappropriation is viewed . . . as part of a single claim of 'continuing misappropriation' accruing *at*

*the time of the initial misappropriation*." <u>Cadence Design Sys., Inc. v. AvantA Corp.</u>, 29 Cal. 4th 215, 218 (2002) (emphasis added). Therefore, because the Court has concluded that plaintiff's claim for misappropriation of trade secrets accrued in 2007 at the latest, the theory of continuous accrual does not aid plaintiffs' effort to assert this claim as to conduct in the three years preceding September 29, 2014.

### b. Continuous Accrual and Conversion

With respect to plaintiffs' claim for conversion, the operative complaint alleges that "[u]pon his resignation from AFA [in 2006]," Travolta "intentionally and substantially interfered with Plaintiffs' property by taking possession of their assets and converting such assets to Defendants' own use and benefit." FAC at ¶ 179. Under California Code of Civil procedure 338(c), "which applies to the conversion of personal property, there is a three-year limitations period for 'action[s] for taking, detaining, or injuring any goods or chattels.' " <u>AmerUS Life Ins. Co. v. Bank of Am., N.A.</u>, 143 Cal. App. 4th 631, 639 (2006). Furthermore, as with plaintiffs' misappropriation claim, the " 'statute of limitations for conversion is triggered by the act of wrongfully taking property.' " <u>Id.</u> (quoting <u>Bono v. Clark</u>, 103 Cal. App. 4th 1409, 1433 (2002)). Accordingly, the rationale underlying the continuing violation doctrine is inapplicable to a claim that is "triggered by the act of wrongfully taking property."

### c. Continuous Accrual and Interference with Economic Relationships

Plaintiffs' claim for interference with economic relationships is subject to a two-year statute of limitations. <u>Augusta v. United Serv. Auto. Assn.</u>, 13 Cal. App. 4th 4, 10 (1993) (citing Cal. Code Civ. P. § 339). To the extent plaintiffs allege in their complaint that the continuous accrual theory applies to this claim, the Court is unaware of any authority applying this equitable doctrine (under California law) to tortious interference claims; indeed, some courts in this circuit have noted the dearth of any such authority. <u>See</u> <u>DC Comics v. Pac. Pictures Corp.</u>, 938 F. Supp. 2d 941, 949 (C.D. Cal. 2013), <u>appeal docketed</u>, No. 14-56926 (9th Cir. Dec. 10, 2014) (noting that the court was unaware of any cases "directly applying either of California's continuing-wrong principles to tortious-interference claims"); <u>Nano-Second Tech. Co. v. Dynaflex Int'l</u>, No. CV 10-9176 RSWL MANX, 2013 WL 1855828, at *3 (C.D. Cal. May 1, 2013) (finding that "the theory of continuous accrual does not toll the statute of limitations for tortious interference claims, and should not be invoked in this Action"); <u>Boon Rawd</u>

Trading Int'l v. Paleewong Trading Co., Inc., 688 F. Supp. 2d 940, 952 (N.D. Cal. 2010) (noting that "based upon an examination of California decisions that have applied the 'continuing tort' doctrine, none have extended the doctrine to the tort of intentional interference with prospective economic advantage").

Furthermore, plaintiffs' operative complaint contains only vague allegations of "continuous" interference with economic relationships, failing to specifically allege that defendants have interfered with any particular economic relationships in the two years preceding plaintiffs' assertion of this claim. See, e.g., FAC at ¶¶ 127 ("Defendants continue to interfere with Dr. Wolf's economic relationships by continuing to exploit her intellectual property . . . without her permission."), 131 ("Travolta, through his instruction, manipulation, and/or undue influence of others, has engaged in a continuous court of conduct of interfering with Dr. Wolf's existing and prospective business relations."). Plaintiffs have also failed in their separate statement to point to any genuine dispute of material fact regarding any alleged interference with economic relationships in recent years. See generally PS. Accordingly, on the record before the Court, the theory of continuous accrual does not appear to apply to this claim.

### d.   Continuous Accrual and Breach of Fiduciary Duty

Plaintiffs' breach of fiduciary duty claim alleges that "[a]s President and board member of AFA, Defendant Travolta had fiduciary duties to Dr. Wolf and AFA," including, *inter alia*, duties of undivided loyalty, good faith, confidentiality, reasonable care, and a duty to refrain from using his position for his own benefit and to the detriment of AFA. FAC at ¶ 139. Plaintiffs thus allege that Travolta's use of plaintiffs' "copyrighted work, business strategies, and client lists" constitutes a breach of the aforementioned fiduciary duties. FAC at ¶ 144. "The statute of limitations for breach of fiduciary duty is three years or four years, depending on whether the breach is fraudulent or non-fraudulent." American Master Lease LLC v. Idanta Partners, Ltd., 225 Cal. App. 4th 1451, 1479 (2014). In certain contexts, courts have applied California's continuous accrual theory to breach of fiduciary duty claims. See, e.g., Yamauchi v. Cotterman, 84 F. Supp. 3d 993, 1015 (N.D. Cal. 2015) (Chen, J.) (granting motion to dismiss breach of fiduciary claim because "on the face of the Amended Complaint, [plaintiff] has not alleged any timely breaches of fiduciary duty against the [defendants], even applying a theory of continuous accrual"); POGA MGMT PTNRS LLC v. Medfiler LLC, No. C 12-06087 SBA, 2014 WL

1   3963854, at *10–*11 (N.D. Cal. Aug. 12, 2014) (denying motion to dismiss plaintiffs' breach of
2   fiduciary claim because theory of continuous accrual applied).

3        Here, however, as with their interference with economic relationships claim, plaintiffs' operative
4   complaint provides only conclusory allegations of a continuous breach of fiduciary duties without
5   reference to any specific breaches that fall within three or four years of the assertion of this claim.  See,
6   e.g., FAC at ¶ 149 ("Travolta's fiduciary duties owed to Dr. Wolf continue regarding the information
7   he held in confidence [while he was President of AFA], specifically the curricula to which he had access
8   by virtue of his former position with Actors for Autism . . . [and] each act of using Dr. Wolf's work
9   without her permission is a new and independent injury"); see also id. at ¶ 150.  Nor have plaintiffs
10  pointed the Court to any evidence in an affidavit, deposition, or elsewhere that would create a triable
11  issue of fact as to whether any such breaches of fiduciary duty occurred in recent years.  See Lujan, 497
12  U.S. at 888-89 ("The purpose of Rule 56 is to enable a party who believes there is no genuine dispute
13  as to a specific fact essential to the other side's case to demand at least one  sworn averment of that fact
14  before the lengthy process of litigation continues."); cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
15  249 (1986) ("[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any
16  significant probative evidence tending to support the complaint' ") (citation omitted).

17                         **e.      Continuous Accrual and the UCL**

18       Plaintiffs' UCL claim is governed by the four-year statute of limitations set forth in section
19  17208. Cal. Bus. & Prof. Code § 17208 ("Any action to enforce any cause of action pursuant to this
20  chapter shall be commenced within four years after the cause of action accrued.").  In Aryeh, the
21  California Supreme Court clarified that the UCL "is governed by common law accrual rules to the same
22  extent as any other statute," such that " 'the nature of the right sued upon' and the circumstances
23  attending its invocation control the point of accrual."  Aryeh, 55 Cal. 4th at 1196 (citation omitted).
24  Accordingly, the court in Aryeh applied the continuous accrual doctrine to plaintiff's UCL claim.  Id.
25  at 1201 (explaining that if certain conduct is "actionable as an unfair business practice under the UCL,"
26  then each monthly recurrence of such conduct "would constitute a new unfair act with its own attendant
27  limitations period").  Thus, application of the continuous accrual theory in the instant action would
28  / / /

"permit [Wolf] to sue [under the UCL], but only for those discrete acts occurring within the [four] years immediately preceding the filing of h[er] [UCL claim on September 29, 2014]." Id. at 1199-1200.

As explained *supra*, the UCL claim in the instant action is premised upon defendants' "unfair, deceptive, and fraudulent" (1) misappropriation and misuse of plaintiffs' copyrighted works, (2) improper diversion of and interference with plaintiffs' business relationships, and (3) false and misleading representations about Wolf and her work. See, e.g., FAC at ¶¶ 109, 110, 113. Plaintiffs have failed sufficiently to allege that any such acts occurred in the four years preceding plaintiffs' September 29, 2014 assertion of the UCL claim. Accordingly, reliance upon the continuous accrual theory is, based upon the current record and briefing, unavailing.

### iv.    Conclusion

Thus, in accordance with the foregoing, all of plaintiffs' state law claims are time barred, as plaintiffs were on sufficient notice of these claims in early 2007, and plaintiffs cannot, based upon the current record, avail themselves of either the discovery rule or the theory of continuous accrual.

### V.    CONCLUSION

In accordance with the foregoing, defendants' motion for summary judgment is hereby **DENIED in part** and **GRANTED in part**.

Specifically, defendants' motion is **DENIED** insofar as it seeks to invalidate plaintiffs' two underlying copyrights. The motion is **GRANTED** insofar as (1) it argues that all of plaintiffs' state law claims are time-barred, and (2) it seeks to bar damages from copyright infringement beyond the three years preceding plaintiffs' assertion of the two copyright claims in this suit.[15] In addition, having given the parties notice and a reasonable time to respond pursuant to Federal Rule of Civil Procedure 56(f)(3),

/ / /

/ / /

/ / /

---

[15] As a reminder, plaintiffs' claims were first asserted in this action on the following dates: February 6, 2014 (first claim for copyright infringement of the May 2006 Work); September 29, 2014 (five state law claims); and August 5, 2015 (second claim for copyright infringement of the September 2006 Work).

the Court hereby **GRANTS** summary judgment in favor of defendants as to the entirety of plaintiffs' two copyright claims.

IT IS SO ORDERED.

DATED: March 4, 2016

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE